# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

RANDALL KEITH PATE,

    Plaintiff,

vs.                                                                               CASE NO. CV-10-J-1030-S

MICHAEL ASTRUE, Commissioner
of Social Security,

    Defendant.

## MEMORANDUM OPINION

    The plaintiff, Randall Keith Pate, brings this action pursuant to the provisions of 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits and Supplemental Security Income.

    Plaintiff filed his applications for benefits on August 7, 2006, alleging an inability to work from October 12, 2006 (R. 139–44, 144–49),[1] due to problems from depression, anxiety, carpel tunnel syndrome, back pain, and borderline intelligence. The application was denied initially on October 31, 2006, (R. 69–78), and again by an Administrative Law Judge on August 26, 2009, (R. 21–33).

---

[1] Originally plaintiff alleged an inability to work from June 1, 2004, but plaintiff amended the onset date from June 1, 2004, to October 12, 2006. (R. 41).

## Factual Background

At the time of the hearing before the Administrative Law Judge ("ALJ"), plaintiff was forty-four (44) years old and had an eighth-grade education. (R. 49).[2] He had previously worked for a steel company on and off for about eighteen years. (R. 47).

The plaintiff alleges an inability to work due to chronic back pain, anxiety, and depression. (R. 41–42). He had worked for a steel company for eighteen years but has not worked since his alleged onset date. (R. 42, 47). He states that he doesn't get along with people, that crowds make him nervous, and that this hinders him from working around others (R. 42, 174–75). He says that he isolates himself, doesn't have any friends, and doesn't have much of a social life. (R. 43–45). He has trouble concentrating and has little ability to remember things. (R. 47, 175). He doesn't spell, read, or do math very well, and his wife handles the finances at home. (R. 49). He also states that he received special education assistance while in school and that he repeated two grades. (R. 295). As for his back pain, plaintiff states he can only sit for an hour before the pain is overwhelming, and that standing tends to alleviate the pain. (R. 46). He says he must also sit down after an hour of standing. (*Id.*). He states that his pain is at a 6–7 daily without medication,

---

[2]Plaintiff was forty-one (41) years old as of his alleged onset date. (R. 32).

and drops to a 4–5 with medication. (R. 49–50). He also alleges carpal tunnel and wrist pain due to a work injury. (R. 52). He wears a splint on his wrist at night and has lost strength in his left hand and fingers. (R. 52, 164).

The ALJ found that the plaintiff suffers from the following severe impairments: anxiety disorder, depression, and carpel tunnel syndrome; with the following non-severe impairments: hypertension, obesity, borderline intellectual functioning,[3] and a history of left upper and lower extremity injury. (R. 23). The ALJ found that none of these impairments constituted an impairment or combination of impairments that meets or medically equals one of the listed impairments. (R. 25). The ALJ further determined that plaintiff had the residual functional capacity to perform a modified range of "medium work." (R. 26–27).[4]

---

[3]The ALJ ruled out mental retardation under listing 12.05, reasoning that "there is no documentation of an IQ score in the range of mental retardation or other documentation of significantly subaverage general intellectual functioning prior to age 22 . . . ." (R. 25). Moreover, he focused on the fact that the plaintiff had been able to "work successfully at the level of substantial gainful activity for a great many years." (*Id.*).

[4]Specifically, the ALJ found that the plaintiff:

[I]s able to lift and carry up to 50 pounds occasionally and 25 pounds frequently. He can stand or walk for 6 hours and can sit for 6 hours out of an 8-hour workday. He is unable to climb ropes, ladders, and scaffolding, and must avoid concentrated exposure to cold temperatures and all exposure to workplace hazards such as dangerous moving machinery and unprotected heights. The claimant is able to perform simple, unskilled work. He can understand, remember and complete simple tasks, and can maintain attention sufficient for completion of 1 – 2 step tasks, but would have only limited concentration for the performance of detailed tasks. The claimant can maintain basic hygiene standards and can complete an 8-hour workday

The ALJ then found plaintiff was unable to perform any past relevant work, relying on the vocational expert's finding that the claimant could not perform past work. (R. 32, 56). Finally, the ALJ found that there were other jobs plaintiff could perform and he was therefore not disabled as defined by the Social Security Act. (R. 32–33).[5]

The plaintiff's medical records demonstrate as follows:

Plaintiff first complained of weakness in his left arm when his wife called Bessemer Family Practice on December 22, 2000. (R. 221). He was seen by Dr. Sally Ebaugh on December 26, 2000. (R. 217, 221). The doctor's notes state that, four months previously, plaintiff cut himself to the bone on his left arm and covered it with duct tape. (R. 217, 221). As a result, he has no strength in his arm. (R. 217). Plaintiff was seen on December 19, 2000, by Dr. Nasrollah Eslami, who administered an EMG and diagnosed plaintiff with "relatively mild left Carpal

---

> with customary work breaks. He would function best in a well-spaced work setting with a flexible schedule, and is able to perform work requiring no more than casual, non-intense interaction with the public, co-workers, and supervisors. Supervision should be supportive and non-confrontational. The claimant would be able to perform work in an environment where changes and expectations are only gradually and infrequently introduced.

(R. 27). This determination is consistent with those made by Dr. Dale Leonard and Dr. Rick Ensley. (R. 281–92).

[5] The vocational expert found that the plaintiff could perform the requirements of representative occupations such as a Production Assembler and a Hand Packager. (R.56).

Tunnel Syndrome." (R. 216). Both doctors suggested that he wear a wrist splint. (R. 216–17).

Plaintiff was seen at UAB Health Center on February 11, 2004, and July 6, 2004, and was diagnosed with elevated blood pressure, hypertension, and left knee pain. (R. 227–29).

Plaintiff saw his primary care physician, Dr. Sulaf J. Mansur, at Cooper Green Hospital, from June 16, 2006, through May 8, 2009. (R. 245–46, 249–51, 255–56, 314–16, 319–34). Dr. Mansur continually noted anxiety, hypertension, neck pain, hip pain, and carpel tunnel syndrome. (R. 245, 249–51, 252, 255, 328, 331, 333). Plaintiff had an EMG done on his wrist on July 26, 2006, which also resulted in a diagnosis of carpal tunnel syndrome. (R. 247–48). On March 28, 2007, plaintiff was referred for an MRI of the lumbar spine at Healthsouth. (R. 313). The tests were negative overall, but did note a small disc herniation at L5-S1. (*Id.*). In 2009 the doctor's notes indicated pervasive sinus problems, including nasal obstruction and a deviated septum. (R. 320–30, 332–33).

On October 11, 2006, Dr. Warren Seiler performed a consultative physical evaluation of plaintiff. (R. 258–62). Plaintiff had limited hip flexion, a positive Phalen's test, and numbness and tingling in his fingers and thumbs. (R. 261). He showed multiple areas of back pain and was diagnosed with likely carpal tunnel

syndrome. (R. 262).

On October 12, 2006, Dr. John Neville performed a consultative psychological evaluation of plaintiff. (R. 264–66). Dr. Neville found that plaintiff "did not appear depressed" or anxious, had no "hallucinations, delusions, ideas of reference or loose associations," and that his "range of affect was normal." (R. 264–65). The doctor found plaintiff's intellectual functioning to be in the borderline to mildly retarded range. (R. 265).[6] Dr. Neville also noted plaintiff's daily activities and concluded that he had "Intermittent Explosive Disorder" and "Borderline Intellectual Functioning, . . . Rule Out Mild Mental Retardation." (R.

---

[6]Dr. Neville's notes indicate that:

> [Plaintiff] responded correctly when asked his date of birth and age. [He] knew his home address and phone number. He was not able to complete any calculations on serial sevens. [He] completed two out of five calculations correctly on serial threes. He answered one out of two addition, subtraction and multiplication problems correctly. [He] was not able to complete any division problems correctly. He was able to count backwards from 20 to 1 without error. [He] was not able to spell world backwards. He recalled seven digits forward and three digits backward. [He] remembered two out of three items after a five-minute delay. He was able to discuss his past day's activities. [He] knew his children's birthdays. He was able to name the current President and Governor. [Plaintiff] was able to identify the national and state capitols. He was able to discuss some current news events. [He] answered two out of three questions regarding general information correctly. He responded fully correctly to one out of three items about similarities between paired objects. [He] answered two out of three questions regarding social knowledge fully correctly. His other answer was partially correct. When asked the meaning of the expression, "don't cry over spilt milk," he responded don't be sad over something you can't do nothing about.

(R. 265).

266). Dr. Neville recommended psychiatric treatment and psychotherapy to address plaintiff's impulse control problems. (*Id.*).

On October 30, 2006, plaintiff underwent tests to determine his mental and physical residual functional capacities. (R. 281–92). Dr. Dale Leonard performed plaintiff's mental exam (R. 289–92), determining that plaintiff could "maintain attention sufficiently to complete simple, 1- to 2-step tasks for periods of at least 2 hours, without the need for special supervision or extra work breaks" (R. 291). Further, Dr. Leonard stated that plaintiff "can tolerate casual, non-intense interaction with members of the general public and coworkers," and that "supervision and criticism should be supportive and non-confrontational." (*Id.*). Further, "changes in the work environment or expectations should be infrequent and introduced gradually." (*Id.*).

Dr. Rick Ensley performed plaintiff's physical exam. (R. 281–88). Dr. Ensley determined that plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently; stand about 6 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday; climb ramps or stairs, balance, stoop, kneel, crouch, and crawl frequently, but never climb ladders, ropes, or scaffolds. (R. 282–83). He further determined that plaintiff has no manipulative, visual, or communicative limitations; plaintiff's only environmental limitations were to

avoid concentrated exposure to extreme cold and avoid all exposure to hazards such as dangerous machinery or unprotected heights. (R. 284–85).

On December 4, 2008, the claimant had a psychological examination performed by Dr. Robert Storjohann. (R. 295–303). Dr. Storjohann noted that plaintiff appeared to be "quite dysphoric, despondent, forlorn, very ill-at-ease, restless, and distracted," and that he appeared to be anxious and tense. (R. 297–98). Dr. Storjohann tested plaintiff's IQ: plaintiff achieved a verbal score of 72, performance score of 64, and a full score of 66. (R. 298). These scores placed his verbal skills in the low borderline range, his performance skills in the mild range of mental retardation, and his overall abilities in the mild range of mental retardation. (R. 299). Plaintiff also took a "Wide Range Achievement Test–Revised," which tests academic skills. (*Id.*). Plaintiff scored 57 in reading, 56 in spelling, and 55 in arithmetic. (*Id.*). This placed plaintiff's skills at or below the third-grade level, indicating that he is functionally illiterate. (*Id.*). Moreover, these skills were in the mild range of mental retardation. (*Id.*). Dr. Storjohann stated that the findings were consistent with plaintiff's IQ tests and his reported academic history. (*Id.*). Dr. Storjohann came to the conclusion that plaintiff had, among other things: major depression, recurrent, severe, without psychotic features; generalized anxiety disorder; attention-deficit/hyperactivity disorder, combined

type; mild mental retardation; paranoid personality disorder; schizoid personality disorder; chronic pain in his lower back; loss of grip strength in his left arm and hand due to carpal tunnel syndrome; high blood pressure; educational, occupational, and economic problems; and a GAF (Global Assessment of Functioning) of 45.[7] (R. 300). Dr. Storjohann stated that the plaintiff was "in need of intensive mental health treatment" and that he appears to have "marked to extreme deficits in his ability to respond appropriately to supervision, coworkers, and work pressures in a work setting." (*Id.*).

## Standard of Review

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). This

---

[7]Plaintiff's highest GAF in the past year was also 45. (R. 300).

court may not decide facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ, even if the court finds that the weight of the evidence is against the Commissioner's decision. *Martin*, 894 F.2d at 1529.  This court must affirm the decision of the ALJ if it is supported by substantial evidence. *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). The Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## Legal Analysis

Plaintiff argues that the ALJ's findings as to the plaintiff's mental functioning are contrary to the substantive evidence on record. Pl.'s Brief at 10–15. Plaintiff argues that he is disabled because he meets medical listing 12.05. Under the diagnostic definition, "[m]ental retardation refers to significantly

subavarage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.05 (2009).

An IQ test creates a rebuttable presumption of a fairly constant IQ during a person's lifetime absent evidence of a sudden trauma that can cause retardation. *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("Mental retardation is not normally a condition that improves as an affected person ages. . . . Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (holding that absence of an IQ test in developmental years did not preclude a finding of mental retardation predating age twenty-two and courts should assume an IQ remained constant absent evidence indicating change in intellectual functioning).

Listing 12.05C states that the required level of severity for mental retardation is met when the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing and additional significant work-related limitation of function." 20 C.F.R. pt. 404,

subpt. P, app. 1, Listing 12.05. In order for a claimant to meet the requirements under 12.05C, the impairment must satisfy the diagnostic description of 12.05 and the criteria of listing 12.05C. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A. A claimant has an additional mental or physical impairment when the impairment's effect on "a claimant's ability to perform 'basic work activities' is more than slight or minimal . . . but less than 'severe.'" *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985).

Plaintiff's IQ tests are objective evidence of his intellectual functioning. Plaintiff's tests resulted in a verbal IQ of 72, a performance IQ of 64, and a full scale IQ of 66. (R. 298). Two of these scores are well within the 60–70 range required by 12.05C, indicating mental retardation. Since there is no evidence in the record of an event which may have caused a change in intellectual functioning, it is presumed that plaintiff functioned at these IQ levels throughout his life, and specifically, prior to age 22.

Moreover, the ALJ was incorrect in noting that Dr. Storjohann's and Dr. Neville's findings contradicted one another. Both doctors found that plaintiff's level of intellectual functioning was extremely low. Dr. Neville determined that plaintiff's intellectual functioning was "estimated to be in the borderline to mildly retarded range" (R. 265–66); this does not contradict Dr. Storjohann's finding of

mild mental retardation. Rather, Dr. Storjohann's performance of IQ testing on plaintiff lends further credence to his determination; Dr. Neville's evaluation was based purely on personal observation and review of plaintiff's medical history. (*See* R. 246–66). Moreover, Dr. Storjohann found a GAF of 45, which, under the DSM-IV standards established by the American Psychiatric Association, represents serious symptoms in social, occupational, or school functioning which would render an individual unable to keep a job. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed. (Washington D.C., American Psychiatric Association, 1994), at 32. In addition, Dr. Storjohann administered WRAT-R testing and found plaintiff to be functionally illiterate. (R. 298–99). Dr. Storjohann found that the test results represented an accurate appraisal of plaintiff's abilities. (R. 298). The record shows that plaintiff did not perform well in school and was unable to complete a high school education. These objective tests, combined with the other evidence regarding plaintiff's school-age activities, point strictly to a finding of mild mental retardation.

This court does not mean to suggest that the Commissioner must take plaintiff's IQ tests at face value. *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the

claimant's daily activities and behavior."). However, plaintiff's past work history does not rebut the presumption that he suffers from mild mental retardation. Plaintiff's prior work consisted of heavy menial labor that the vocation expert classified as unskilled work. (R. 55). Plaintiff's prior jobs required mere brute strength and could be done regardless of his mental ability or capacity. Once his strength declined due to his various physical impairments, however, plaintiff did not have the basic mental or intellectual functioning capacity to be able to do other work.

    Plaintiff's severe impairments of carpal tunnel syndrome, depression, and anxiety, combined with his chronic leg and back pain easily satisfy the second prong of Listing 12.05 since they have a marked effect on his ability to do work. Given these impairments, as well as plaintiff's mental limitations, the Social Security regulations demand a finding of disabled. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.05.

    The ALJ's determination that the plaintiff is not disabled is against the substantial weight of the evidence. The ALJ could only reach the result he did by ignoring the objective medical evidence regarding the plaintiff's mental capacity, which mandates reversal. This court finds that the substantial weight of the evidence dictates that the plaintiff has been disabled since his alleged onset date

and is therefore entitled to benefits.

## Conclusion

When evidence has been fully developed and points to a specific finding, the reviewing court may enter the finding that the Commissioner should have made. *Reyes v. Heckler*, 601 F. Supp. 34, 37 (S.D. Fla. 1984). Thus, this court has the authority under 42 U.S.C. § 405(g) to reverse the Commissioner's decision without remand, where, as here, the Commissioner's determination is in plain disregard of the overwhelming weight of the evidence. *Davis*, 985 F.2d at 534; *Bowen v. Heckler*, 748 F.2d 629 (11th Cir. 1984).

Based on the lack of substantial evidence in support of the ALJ's findings, it is hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and this case be **REMANDED** to the Agency to calculate the plaintiff's monetary benefits in accordance with this Opinion, which shall be done by separate order.

**DONE** and **ORDERED** this 15th day of December 2010.

*[signature]*

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE